IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

PATRICK JOSEPH,

    PLAINTIFF

          vs

NEW YORK CITY POLICE DEPARTMENT
DETECTIVE RICHARD KENNEY, in his
individual and in his official
capacities, NEW YORK CITY POLICE
DEPARTMENT LIEUTENANT AUGUST ROSSY,
in his individual and in his official
capacities, "JOHN DOES", in their
individual and in their official
capacities, EVAN RUSTER,

    DEFENDANTS
_____

08 Civ 00004/GBG/GWG
COMPLAINT [JURY TRIAL]

## I. INTRODUCTION

1.  This is an action against the Defendants, individually and collectively, in which the Plaintiff seeks relief for the violation of the Plaintiff's rights as guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.  In addition this is an action for the violation of the Plaintiff's rights under the laws and Constitution of the State of New York.

2.  The Plaintiff claims that he was falsely arrested and falsely and excessively imprisoned and maliciously prosecuted and subjected to the violation of his rights as guaranteed under law as a consequence of the actions and conduct of the Defendant

parties, individually and collectively.

3.  The Plaintiff seeks relief for the violation of his rights as guaranteed under the laws and Constitution of the United States and the laws and Constitution of the State of New York.

## II. JURISDICTION

4.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sections 1331 and 1343 in conjunction with the Civil Rights Act of 1871, 42 U.S.C. Section 1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5.  Jurisdiction of this Court is also invoked pursuant to Supplemental Pendent Claim and Pendent Party Jurisdiction, 28 U.S.C. Section 1367, in conjunction with the laws and Constitution of the State of New York.

6.  The State law claims against Defendant Evan Ruster have a common nucleus of operative fact with the federal claims.  The State law claims against Evan Ruster derive from and out of the same facts and transaction which give rise to the federal law claims which are being asserted herein against Defendant Richard Kenney and Defendant August Rossy.

7.  Because of the inter-relatedness of the State law claims to the federal claims, the Plaintiff contends and asserts that it is in the interests of justice, comity, and the economical administration of court dockets to resolve the State law claims against Defendant Evan Ruster in this proceeding and as part and parcel of the resolution of the federal law and federal jurisdictionally invoked claims against Defendants Richard Kenney

2

and August Rossy.

8.   Plaintiff also invokes the jurisdiction of this Court in conjunction with the Declaratory Judgment Act, 28 U.S.C. Sections 2201, et seq., this being an action in which the Plaintiff seeks not only damages but, as well, whatever other relief the Court deems appropriate and just to provide complete relief and/or to promote the interests of justice including, if appropriate, declaratory and injunctive relief.

9.   This is an action in which the Plaintiff seeks damages and whatever other relief is appropriate and in the interest of justice in order to vindicate the violation of his rights as guaranteed under the laws and Constitutions of the United States and the laws and Constitution of the State of New York.

### III. PARTIES

10.  Plaintiff is a Haitian American citizen who resides in the City of New York, the County of Kings, and the State of New York. The Plaintiff came to New York when he was twelve years old and subsequently became an American citizen. The Plaintiff is thirty nine years of age. The Plaintiff's birth date is February 13, 1968.

11. Defendant Evan Ruster is an American citizen. The Defendant has his office for doing business in New York County. It is believed, as well, that the Defendant resides in New York County.

12. Defendants Richard Kenney and August Rossy are New York

3

City Police Officers, the former with the rank of Detective and the latter with the rank of Lieutenant.

13. Although the actions and conduct of Defendants Kenney and Rossy hereinafter described were unlawful and violative of the Plaintiff's federally guaranteed constitutional and civil rights, they were taken incidental to the otherwise lawful exercise of their duties and functions as New York City Police Officers and as employees and agents of the City of New York.

14. Defendants August Rossy and Richard Kenney were, accordingly and for the purposes of the Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983, acting "under color of State law" and as "State actors".

15. This Court is the appropriate and proper venue for the resolution of the federal law and question claims encompassed within the litigation and, as well, for the resolution of the inter-related State law claims.

IV. ALLEGATIONS

16. Until his termination from his position, the Plaintiff was employed at Eleven Riverside Drive Corp., otherwise known as the Schwab House, a cooperative residential apartment building composed of multiple apartment residences, located on the Westside of Manhattan.

17. The Plaintiff commenced his employment when he was approximately twenty two years of age and, while employed at  the

4

Schwab House, the Plaintiff became a naturalized American citizen.

18.   Prior to his termination, the Plaintiff had been employed at the Schwab House for approximately fifteen years.

19.   During the last approximately ten years of his employment at the Schwab House, the Plaintiff functioned as a service elevator operator.

20.   Throughout his employment, the Plaintiff was known as an honest, hard working individual who performed his duties and functions at the Schwab House in at least a satisfactory and better than satisfactory manner and fashion throughout his career.

21.   For an example and in that regard with respect to his acknowledged integrity and honesty, in May, 2000, the Plaintiff received a pay check overpayment from his employer.

22.   The Plaintiff brought such to the attention of the management at the Schwab House and, in return, was informed, in writing, that the management at Schwab House appreciated the Plaintiff's "honesty and integrity".  As a result and as a reward of his "honesty and integrity", he was given an extra day off with pay.

23.   During his employment at the Schwab House, the Plaintiff also received a certificate of recognition for his dependability in serving the Schwab House community. The Plaintiff has much support and many references from and among residents, who have known him over time, in the Schwab House.

24.   In or about February, 2006, the Plaintiff was approached

by Defendant Evan Ruster.

25.  Prior to her death, Defendant Ruster's mother had resided in apartment # 2MW at the Schwab House.

26.  When Defendant Ruster's mother passed away, Defendant Ruster was undertaking to clear the residence in preparation to vacate the premises and sell such.  It is believed that, subsequent to his mother's death, Defendant Ruster had stayed at and/or utilized his deceased mother's residence.

27.  Defendant Ruster informed the Plaintiff that his mother had passed away and that there were things in his mother's residence that he wanted to discard.

28.  Defendant Ruster indicated to the Plaintiff that he could come to the apartment with him and see whether there was anything which the Plaintiff wanted.

29. The Plaintiff did go to the apartment of the Defendant's deceased mother with the Defendant. However, the Plaintiff did not see anything which he wanted and the Plaintiff left.

30.  Defendant Ruster informed the Plaintiff that he should let other of the employees know that they, too, were free to come up to the residence and see whether there was anything that they wanted and, if so, that they were free take such.

31.  It is believed, too, that Defendant Ruster himself informed other employees of that which he informed the Plaintiff.

32.  The advisement by Defendant Ruster to the Plaintiff was, in all respects, non conditional.

33.  Defendant Ruster further indicated to the Plaintiff that he would otherwise throw out the things which were in the residence and that he did not want to pay a mover to remove the things in his deceased mother's residence in the Schwab House building and/or to pay the Schwab House a fee as were required by the building rules when individuals vacated apartments in the building.

34.  On or about March 8, 2006, the Plaintiff came to work and was informed by his supervisor that, before the Plaintiff started to work on his 4:30 P.M. shift, a New York City Police Department detective, who was at the Schwab House, wanted to speak with him. It is believed that the individual was Defendant Richard Kenney, then holding the rank and title of "detective".

35.  Detective Kenney informed the Plaintiff that he wanted to speak with the Plaintiff about property that was taken and allegedly stolen from a residence of the Defendant Ruster's deceased mother.

36.  While the Plaintiff understands and speaks English, his English language facilities are modest.

37.  At or about the time as described herein the Plaintiff who was the service elevator operator at the Schwab House and had been performing the duties and functions of a service elevator operator at the Schwab House for approximately ten [10] years.

38.  Some time prior to March 8, 2006, the Plaintiff was, per his ordinary duties and functions as an employee at the Schwab

7

House, operating the service elevator when Leo Palmero, another
individual employed by the Schwab House, had removed a dryer from
Defendant Ruster's deceased mother's residence.

39.  The dryer, which was it is believed inoperable, was taken
down in the service elevator operated by the Plaintiff and removed
from the Schwab House building by Leo Palmero.

40.  The Plaintiff held the gate for Leo Palmero when the
dryer was removed from the Schwab House building by Leo Palermo.

41.  Also present at the time the dryer was removed from the
Schwab House building was another Schwab House employee, Fatch
Alqalisa.

42.  When the Plaintiff was informed by Defendant Ruster that
there were items and materials in the residence that he could take
and which he declined to do, Defendant Ruster also informed the
Plaintiff that he could inform other Schwab House employees of the
same which the Plaintiff did, again at the request of Defendant
Ruster.

43.  It is believed that Defendant Ruster, himself, informed
other Schwab House employees that they could remove materials and
items from his deceased mother's residence and, as described
hereinafter, it is believed that he informed at least one resident
of such in the presence of the Plaintiff.

44.  The Plaintiff was aware, too, that another employee,
Michael Rivera, had, prior to the removal of the dryer, taken some
china materials from the residence and the Plaintiff believed that

such was the result of Defendant Ruster informing employees in the building that they could take from the residence that which was in the residence at the time since he would otherwise be discarding such.

45.  The Plaintiff had no knowledge of anything other than as described herein and had no reason to believe that anything improper, wrongful or criminal was transpiring; and he still has no belief that such was improper in any way or was otherwise wrongful or criminal.

46.  Once again, the Plaintiff, himself, never removed any items from the residence and never took custody and possession of any item whatsoever that was in the apartment premises nor assisted any individual in taking custody of any items save for the operation of the service elevator as described previously herein.

47.  In fact, the Plaintiff has every belief the removal of the dryer and the china as described had been authorized and sanctioned by Defendant Ruster.

48.  Furthermore, the Plaintiff did not have any reason to believe—and still has no reason to believe, that the action, in which he was engaged [operating the service elevator when items were removed from the residence], was anything other than what he was authorized to do as part of his duties and functions as an employee of Schwab House and that the removal of the items as described by the Schwab House employees was nothing other than the

9

removal of items by employees with the authorization and consent and approval of Evan Ruster as previously described.

49.   The Plaintiff did not wrongly, unlawfully, or criminally assist anyone in unlawfully, criminally, or wrongfully removing anything from Defendant Ruster's deceased mother's residence and the Plaintiff had absolutely no reason to believe that the removal of the dryer or anything else was undertaken by other employees wrongly, unlawfully, and criminally and without the consent, authorization, sanction, and approval of Defendant Evan Ruster since the Defendant Evan Ruster had indicated to the Plaintiff and it is believed to other employees that employees could, if they wanted such,  remove things from the residence even though the Plaintiff had no desire whatsoever to remove anything and so indicated the same to Defendant Ruster when Defendant Ruster inquired of the Plaintiff in this regard [as described previously herein].

50.   Defendant Ruster had been cleaning out his deceased mother's residence, where he claimed the burglary had taken place, for some period of time after the death of Defendant Ruster's mother and Defendant Ruster had informed the Plaintiff, among other employees and it is believed at least one resident in the building, that he and others could have the items in the residence which he was otherwise going to discard and throw away.

51.   As a matter of fact, he indicated that he wanted the Plaintiff and others to remove that which was in the residence

away for him and that he did not want to pay a mover and/or pay the building a fee associated with removal of items and materials form residences in the Schwab House cooperative building.

52.   During the afore-described period, the building was aware that Defendant Ruster was discarding materials and endeavoring to circumvent the Schwab House cooperative building's rules and by-laws requiring that he pay a certain building fee for the removal of materials and items from apartment residences in the building.

53.   Furthermore, the Schwab House building was aware of complaints received from residents in the building about Defendant Ruster's conduct in his deceased mother's residence including the breaking of materials, loud noises generated from the premises, and the discarding of materials and items from the Defendant Ruster's deceased mother's residence.

54.   In fact, the conduct of Defendant Ruster was so problematic that it is believed that at least one resident complained directly to Defendant Ruster about such.

55.   It is believed that Lisa Ashkinos is an owner of apartment # 1MW at 11 Riverside Drive [the Schwab House], a Schwab House residence which is directly below apartment # 2MW, the residence of Defendant Ruster's deceased mother.

56.   It is believed that Lisa Ashkinos went to the residence of Defendant Ruster's deceased mother on several occasions to speak with Defendant Ruster about the enduring and continuing noise which he was generating in Defendant Ruster's deceased

mother's residence and about Defendant Ruster's removal of furniture from the residence.

57.  It is believed that Defendant Ruster was breaking up furniture and otherwise breaking up wall bookcases, among other things, and removing such broken furniture and other items from his deceased mother's residence.

58.  Such removal was against the Schwab House building management rules which required that a mover be hired to remove and/or to cart away furniture, garbage and other matters to be discarded or even kept and/or to pay a fee to the Schwab House building in order to utilize the Schwab House service elevator.

59.  It is believed that the Schwab House building executive manager, Lance Kolb, had, on at least one if not more than one occasion, specifically conveyed to Defendant Evan Ruster the Schwab House building prohibition against self removal of furniture and items and garbage in a residence through the Schwab House service elevator, and conveyed to him as well the Schwab House building requirement that the individual secure a mover and/or pay a building fee in connection with removal of material and items and garbage from a residence being vacated in the Schwab House building.

60.  It is believed, moreover, that Lance Kolb received complaints about the conduct of Defendant Evan Ruster in this respect from residents in the building and that Defendant Lance Kolb believed that Defendant Evan Ruster was endeavoring to

circumvent the rules about which Defendant Evan Ruster had specific notice as conveyed to him by at least Lance Kolb, himself, if not others.

61. It is believed that, on occasions when Lisa Ashkinos went to speak personally with Defendant Evan Ruster, she was escorted by the Plaintiff because Lisa Ashkinos was concerned about the conduct of Defendant Evan Ruster and was concerned about her safety because of Defendant Ruster's reactions to her when she sought to have Defendant Ruster address what she observed was his improper conduct in moving materials out of his deceased mother's residence.

62. In fact, Defendant Evan Ruster did, on at least one occasion, scream at Lisa Ashkinos that Lance Kolb wouldn't allow Defendant Ruster to utilize the elevator to remove furniture and garbage and was endeavoring to extract exorbitant fees from Defendant Ruster in connection with his efforts to remove materials, garbage and items from the Schwab House building.

63. On more than one occasion and in the presence of the Plaintiff, Defendant Ruster indicated to Lisa Ashkinos and to the Plaintiff that everything in the apartment was trash, with, it is believed, the exception of a dining room table, and that both the Plaintiff and the resident could take anything from the residence that she/he desired.

64. Defendant Ruster further stated to Ms. Ashkinos that such removal by her and/or employees would assist him in getting rid of

the items in the residence and would, at the same time, help the other resident[s] because such would avoid future noise about which Ms. Ashkinos and other residents had been complaining.

65.  Defendant Ruster informed both Ms. Ashkinos and the Plaintiff that the door was unlocked at all times since he was not regularly living in or at his deceased mother's apartment residence and that the residence was, save for the dining room table, filled with discardable garbage and items and materials which they were free to take.

66.  No conditions, other than for the reference to the dining room table, were set forth by Defendant Ruster to Lisa Ashkinos and/or to the Plaintiff.

67.  Defendant Ruster informed the tenant that he was breaking furniture, wall units, and other materials in order to be able to have such carted out of his deceased mother's residence apartment in small bags and, by such, to avoid the prohibition and/or fee requirements imposed by the Schwab House Cooperative.

68.  It is believed that, because the situation was so problematic for Ms. Ashkinos and other residents in the building that, after several weeks of terrible noise emanating from Defendant Ruster's deceased mother's residence and the comings and goings and Defendant Ruster, Ms. Ashkinos offered to pay a sum, in the amount of six hundred dollars, for a company to remove the trash herself if Defendant Ruster would only stop the unbearable noise.

69.   It is believed that Defendant Ruster stated that Ms. Ashkinos's offer was "great" and indicated that he would e-mail the resident the name of a friend, who was uninsured, to remove the trash if the resident would agree to pay Defendant Ruster's friend six hundred dollars to remove the trash.

70.   However and because the Schwab House rules required that the mover/carter be insured, it is believed that Ms. Ashkinos indicated to Defendant Ruster that she could not do such because Defendant Ruster's friend was uninsured.

71.   It is believed that on or about February 26, 2006, Defendant Ruster made a complaint to the New York City Police Department in which he claimed that his residence had been burglarized and certain items, including a dryer, some china, some silverware, a painting, a vacuum cleaner, and a fur coat had been taken from the residence against his will and without his authorization or consent.

72.   When Defendant Ruster initially reported to the New York City Police Department on February 26, 2006 that a burglary of his deceased mother's residence had occurred and/or in a subsequent conversation which Defendant Ruster had with Defendant Kenney on February 28, 2006 about the reported burglary, Defendant Ruster reported that he had been away for several days and had not been in the premises for at least three days and he had left the door to the premises unlocked.

73.   Whether or not Defendant Ruster was away or not as he

15

informed Defendant Kenney, Defendant Ruster in fact had left the door to the residence unlocked.

74.  In fact, on February 28, 2006, when Defendant Kenney first went to the building to commence his investigation, he observed that the door remained unlocked and that it did not appear that there had been a forced entry into the premises.

75.  It is believed that Defendant Ruster had, in fact, kept the door to the premises regularly unlocked so as to allow employees and/or at least one resident unfettered access to the premises in order to remove materials and garbage which Defendant Ruster had given the Plaintiff and other employees and Lisa Ashkinos, authority to do so that he could cleanse the residence and ready it for viewing and so that he could circumvent and avoid the rules of the Schwab House with respect to securing movers/carters and/or to paying a fee in order to utilize the Schwab House service elevator for the purpose of removal.

76.  It is believed that whatever reasons were otherwise articulated by Defendant Ruster for leaving the door unlocked, the reason for such was to provide access to the residence so that Schwab House employees could remove items and materials from the residence as he had previously informed them, including the Plaintiff, and, as well, the afore-mentioned resident, and that they could do so without any conditions, except for the afore-mentioned dining room table, associated with the afore-described authorization and consent.

16

77.  Before filing his burglary complaint with the New York City Police Department on February 26, 2006, Defendant Ruster, intentionally, maliciously, recklessly and with deliberate indifference to the consequences of filing the complaint with the New York City Police Department including the consequence of propelling the police to arrest an individual or individuals for an alleged burglary of Defendant Ruster's deceased mother's residence,  made no efforts whatsoever to ascertain whether any items, alleged to have been "stolen", were taken by employees of the Schwab House and/or the resident per his previously given authorization and consent.

78.  On February 28, 2006, Defendant Ruster spoke on the telephone with Defendant Kenney about the alleged burglary which he had reported to the New York City Police Department on February 2, 2006.

79.  At no time, between the reporting of the burglary complaint on February 26, 2006 and February 28, 2006 when Defendant Ruster spoke with Defendant Kenney, did Defendant Ruster ever make any inquiries of any employees or others including residents or management of the Schwab House building about whether or not the employees and/or others, including residents in the building, had taken anything from his residence.

80.  Defendant Ruster deliberately, intentionally, maliciously,  and with reckless disregard for the natural and foreseeable consequence of such, failed to do so, either prior to

initially reporting the alleged burglary to the New York City
Police Department on February 26, 2006 or subsequent thereto at
any time including prior to February 28, 2006 when he first spoke
with Defendant Kenney,  because he knew that he had given
authority, authorization and consent to the Plaintiff and to other
Schwab House employees and to at least one resident of the
building that they were free to remove anything, save for a dining
room table, from the residence as he was discarding such; and that
to report such would have obviated any integrity to his February
26, 2006 burglary complaint which he had filed with the New York
City Police Department and from which he sought to profit by the
filing of such a complaint with the New York City Police
Department.

81.  In fact, at no time, prior March 8, 2006 when the
Plaintiff was arrested, did Defendant Ruster ever undertake
efforts to ascertain from employees or residents at Schwab House
or even from the management at Schwab House whether employees or
residents had inappropriately or mistakenly or otherwise removed
any items from the residence.

82.  Furthermore and at no time during the course of making
the complaint to the New York City Police Department on February
26, 2006 and two days thereafter on February 28, 2006 when
speaking with Defendant Kenney on the telephone about his February
26, 2007 complaint to the Police Department in which he reported a
burglary of his deceased mother's residence or otherwise before

18

the Plaintiff was arrested on March 8, 2006, did Defendant Ruster ever inform Defendant Kenney that, when he commenced the process of removing items from his deceased mother's residence some period of time prior to the date of February 26, 2006, he had informed employees and at least one resident at the Schwab House building that they were free to remove items and materials from the residence and that he had left the residence door unlocked to provide access to the residence toward that end.

83.  In fact, when asked by Defendant Kenney on February 28, 2006 why he had left the residence door unlocked, Defendant Ruster indicated such was to allow access to a real estate agent to show his deceased mother's residence, something which, on its face, made no sense, particularly since the residence was, when Defendant Kenney entered the premises, a mess and in a condition that no one would show to a perspective buyer of the premises.

84.  That mess existed, moreover, throughout the removal process as described and was existent when Schwab House resident Lisa Ashkinos went to the residence on a number of occasions to speak with Defendant Ruster about his conduct and the problems generated by such to the resident and others in the building.

85.  The failure of Defendant Ruster to inquire of the Schwab House management, Schwab House employees, or other Schwab House residents including Lisa Ashkinos and the failure to report to Defendant Kenney the authority and consent he had given employees and residents to remove items from the residence was a conscious

and  intentional and a deliberate and recklessly indifferent "avoidance" by and on the part of Defendant Ruster to ascertain the truth and/or to report the truth and the whole truth to the New York City Police Department about an alleged "burglary".

86.  Such intentional, reckless, and malicious and deliberate indifferent "conscious avoidance" conduct was pursued by Defendant Ruster, throughout, for an ulterior motive: to profit from the reporting of the alleged burglary rather than to have any real interest in recovering the items alleged to have been stolen since Defendant Ruster had no interest in those items whatsoever.

87.  Furthermore Defendant Ruster's conduct of "conscious avoidance" was intentionally and maliciously pursued and undertaken with the reckless and deliberate indifference and disregard for the natural and foreseeable consequences of the arrest and prosecution of individuals for conduct which was, rather than criminal, conduct believed to be lawful and authorized and consented to by Defendant Ruster.

88.  Notwithstanding that Defendant Ruster's comment to Defendant Kenney about the reason he left the door unlocked raised doubt and a real credibility issue for Defendant Kenney about the Ruster reported alleged burglary, Defendant Kenney never further explored that matter with Defendant Ruster before Defendant Kenney undertook to arrest, detain, and put the Plaintiff through the system on March 8, 2006 for the alleged burglary of the premises in question.

89.  During his February 28, 2006 conversation with Defendant
Ruster, Defendant Ruster could not, when asked by Defendant Kenney
to provide confirmatory identification numbers and/or other
identifying information with respect to the alleged stolen fur
coat and the allegedly stolen dryer and china and vacuum cleaner
and painting, do so, and, it is believed, Defendant Ruster never
did so at any time before the Plaintiff was arrested on March 8,
2006.

90.  Once again, such raised doubt in Defendant Kenney about
the credibility and veracity of Defendant Ruster's reported
alleged burglary but Defendant Kenney never addressed such again
with Defendant Ruster again before he undertook to arrest and
detain and put the Plaintiff through the system on march 8, 2006
for the February 26, 2006 Ruster reported alleged burglary of the
premises in question.

91.  In fact Defendant Ruster was endeavoring to circumvent
rules in the Schwab House about the removal of items and materials
from his deceased mother's residence and Defendant Ruster, when he
reported the alleged burglary of his deceased mother's premises,
never informed the police of such.

92.  Furthermore, Defendant Ruster never informed Defendant
Kenney of that fact although and notwithstanding that Defendant
Ruster never reported to Defendant Kenney that he was endeavoring
to circumvent Schwab House rules regarding removal of items from
his deceased mother's residence Defendant Kenney otherwise learned

of such on February 28, 2006.

93.  Although such raised or should have raised further doubt in his mind about the veracity of the alleged "burglary" reported by Defendant Ruster to the New York City Police Department, Defendant Kenney intentionally and recklessly and with deliberate indifferent consciously chose not to further speak with Defendant Ruster before he eventually arrested the Plaintiff on March 8, 2006.

94.  In that regard, at or about the time on February 28, 2006 when Defendant Kenney spoke with Defendant Ruster by telephone about Defendant Ruster's February 26, 2006 reported complaint to the New York City Police Department that his deceased mother's residence in the Schwab House on been burglarized, the Defendant Kenney came to know that there were video cameras at locations within the Schwab.

95.  On February 28, 2006, Defendant Kenney interviewed the Schwab House building executive manager, Lance Kolb, about the Ruster reported burglary of Defendant Ruster's deceased mother's residence.

96.  It is believed that such is the first time that Lance Kolb or any Schwab House management was aware of the alleged burglary as it is believed that Defendant Ruster had never spoken with management about such because, to do so, would have, again, placed Defendant Ruster in jeopardy with the Schwab House building management because Defendant Ruster was knowingly engaged in a

course of conduct designed to circumvent the Schwab House cooperative building's rules.

97.    Defendant Kenney informed Lance Kolb that he wanted to review the video material in the custody and possession of the Schwab House and he further requested that Lance Kolb make a copy of the video material so that Defendant Kenney could look at such. Lance Kolb agreed to do such.

98.    At that time Defendant Kenney had a further exchange with Lance Kolb.

99.    Defendant Kenney memorialized in a New York City Police Department report which Defendant Kenney made at or about the time of the conversation with Lance Kolb that Lance Kolb informed Defendant Kenney that he—Mr. Lance Kolb, the Schwab House building executive manager, "...would not be surprised if [Ruster] made everything up as a parting shot at the [Schwab House] management to get back some money for the fees he was required to pay when he moved out his property".

100.    Such statement should have reinforced Defendant Kenney's already existing doubt about the credibility and veracity of the burglary complaint filed by Defendant Ruster with the New York City Police Department on February 26, 2006, a doubt about Ruster's credibility and veracity which initially arose out of Defendant Kenney's telephone conversation with Defendant Ruster on February 28, 2006 prior to Defendant Kenney's conversation with Lance Kolb and, in addition, an initial doubt which grew out of

the circumstances which Defendant Kenney independently observed when he was present at the residence of Defendant Ruster's deceased mother's residence and was then having the telephone conversation with Defendant Ruster.

101.  Defendant Kenney was out sick for several days after his initial engagement on February 28, 2006 in the investigation of the alleged burglary reported to the New York City Police Department by Defendant Ruster on February 26, 2006.

102.  When he returned to work and because of a telephone call he had received from the Schwab House management while he was out sick, Defendant Kenney went to the Schwab House on March 8, 2006 and reviewed the video material where he observed an individual, not the Plaintiff, removing a dryer out of the Schwab House building.

103.  The individual was identified by John Warpole as an employee of the Schwab House. His name was Leo Palmero.

104.  The individual was not the Plaintiff.

105.  Defendant Kenney also observed on the video that the Plaintiff and another individual were present when the dryer was being removed by Leo Palmero from the Schwab House.

106.  John Warpole identified the Plaintiff as an employee at the Schwab House and the other individual, present with the Plaintiff, as an employee of Schwab House. His name was Fatch Alqalisa.

107.  Neither the Plaintiff nor Fatch Alqalisa were, on the

24

video, doing anything other than being present when the dryer was
then in the custody of the Leo Palmero and was being taken out the
Schwab House building.

108.  The dryer was inoperative and it is believed that
Defendant Ruster was aware that the dryer was inoperative,
something about which Defendant Ruster never informed Defendant
Kenney of such although something which Defendant Kenney
independently ascertain before he arrested the Plaintiff on March
6, 2006 but about which Defendant Kenney never made further
inquiry of Defendant Ruster before arresting the Plaintiff.

109.  Although Defendant Kenney harbored doubt about the
veracity of the burglary complaint filed by Defendant Ruster
because of his initial exchange with Ruster on February 28, 2006
and because of the situation as he observed such on February 28,
2006 and although Lance Kolb, the Schwab House building executive
had previously informed Defendant Kenney that he—Kolb would not be
surprised if Defendant Kenney was making up the burglary
allegations to get back at the Schwab House because of the Schwab
House rules which required him to expend for removal of items and
materials from a residence in the building,  Defendant Kenney did
not speak further with Defendant Ruster in this regard and respect
to ascertain anything further about the Ruster reported and filed
February 26, 2006 burglary complaint.

110.  Such decision and the failure on the part of Defendant
Kenney were reckless and deliberately indifferent.

111.   Rather, Defendant Kenney immediately took into custody Leo Palmero whom Defendant Kenney had observed on the video material removing the dryer from the Schwab House building in the presence of the Plaintiff and Fatch Alqalisa.

112.   Leo Palmero was then at the Schwab House.

113.   Rather than speaking with him at the Schwab House, Leo Palmero was taken into custody and removed from the Schwab House and transported to the 20th Precinct station, a facility in the general neighborhood vicinity of the Schwab House and the Precinct to which Defendant Kenney was assigned as a detective in the burglary unit.

114.   At the Precinct, Leo Palmero, the individual who had been seen on the video material taking the dryer out of the Schwab House building in the presence of the Plaintiff and Fatch Alqalisa, stated to Defendant Kenney that the dryer was inoperative and that Fatch Alqalisa had asked him to help him take the dryer out of the building and to take it to Fatch Alqalisa's residence where Fatch Alqalisa wanted to repair the otherwise inoperable dryer.

115.   Leo Palmero also stated that the Plaintiff had informed him that Defendant Ruster had stated to him that the items in Defendant Ruster's deceased mother's residence were being discarded and that he and others could remove the materials from the residence and take whatever it was that they wanted.

116.   Such was consistent with the information provided to

Defendant Kenney on February 28, 2006 by Lance Kolb, the Schwab
House executive manager who had informed Defendant Kenney that he
would not be surprised if Defendant Ruster was making up the
burglary event in order to "get the building management" and
otherwise to circumvent the building rules which were requiring
him to pay to the building a fee when a Schwab House building
resident or someone acting on behalf of a Schwab House building
resident was removing materials and items from a residence in the
building.

117.  The information provided by Leo Palmero was consistent,
too, not only with the doubt raised by Lance Kolb as to the
veracity of the Defendant Ruster reported burglary complaint to
the New York City Police Department but also with the doubt
initially harbored by Defendant Ruster as to the veracity of the
alleged burglary reported by Defendant Ruster to the New York City
Police Department based on Defendant Kenney's own telephone
conversation with Defendant Ruster on February 28, 2006 and that
which Defendant Kenney otherwise and independently observed on
that date.

118.  At that time Defendant Kenney did not go back to
Defendant Ruster and further investigate the Defendant Ruster
February 26, 2006 asserted and filed burglary complaint to the New
York City Police Department.

119.  Rather, Defendant Kenney detained Leo Palmero at the 20th
Precinct and, then, went back to the Schwab House and took the

Plaintiff, whom he had been informed by the Schwab House would be at work at 4:30 P.M. on March 8, 2006, into custody and transported the Plaintiff to the 20th Precinct.

120.  At the Precinct, the Plaintiff informed Defendant Kenney that he was present when the dryer had been removed from the residence and that he had been informed by Defendant Ruster that material and items in the residence were being discarded and that he and others could, if they wanted such, remove the same and keep the items and materials and that there was open access to the residence for that purpose—removal of materials and items therein.

121.  The Plaintiff never removed anything form the residence for his own personal use or otherwise although he was present in the vicinity of the residence and by the service elevator when the others did remove the dryer.

122.  Thus, the Plaintiff's accounting was, in sum and substance, consistent with Leo Palmero's accounting and otherwise consistent with the doubt already expressed by Lance Kolb as to the veracity of Defendant Ruster's complaint to the New York City Police Department about there having been a burglary of property from Defendant Ruster's deceased mother's residence in the Schwab House.

123.  Furthermore, the Plaintiff's accounting was consistent with the doubt already harbored by Defendant Kenney as to the veracity of the Defendant Ruster initiated February 26, 2006 burglary complaint to the New York City Police Department based on

and deriving from Defendant Kenney's own telephone conversation with Defendant Ruster on February 28, 2006 and Defendant Kenney's own independent observations on February 28, 2006.

124.  Defendant Kenney, however, did not go forward and undertake to further speak with Defendant Ruster, this notwithstanding that, when learning all of this from the individual who took the dryer out of the residence and from the Plaintiff as described, Defendant Kenney consulted with his supervisor Defendant Rossy, and Defendant Rossy informed him that he should speak, again, with Defendant Ruster.

125.  Rather, Defendant Kenney then called Mr. Warpole, the assistant executive manager of the Schwab House, and advised Mr. Warpole to have the third individual, Fatch, Alqalisa, who was then in the possession and custody of the dryer, to come to the 20th Precinct and to ask for Defendant Kenney because Defendant Kenney wanted to speak with him about the situation as described.

126.  Fatch Alqalisa appeared at the Precinct and, in sum and substance, stated to Defendant Kenney that which had previously been conveyed to him by the Plaintiff and by Leo Palmero and which information, individually and collectively, reinforced or should have reinforced the doubt harbored initially by Defendant Kenney, based on his own February 28, 2006 conversations with Defendant Ruster and with Lance Kolb and based on Defendant Kenney's own observations on February 28, 2006, about the veracity of Defendant Ruster's February 26, 2006 complaint to the Police Department that

his deceased mother's residence on been the subject of a burglary.

127.  During the questioning of Fatch Alqalisa, Defendant Kenney learned that a fourth individual, Michael Rivera, had removed some china from the residence.

128.  During the questioning of Fatch Alqalisa on March 8, 2006, Defendant Kennedy learned the name of the individual, Michael Rivera, who had supposedly removed some china and silverware from the residence of Defendant Ruster's deceased mother's residence.

129.  Defendant Kennedy was not able to reach Michael Rivera and reached out to the Schwab House management that he wanted to speak with that individual and to have that individual call him.

130.  On March 8, 2006, Defendant Kenney released Leo Palmero, whom Defendant Kenney had observed on the video material to be in custody and possession of the dryer and to observe him remove the dryer from the Schwab House building. Defendant Kenney released Leo Palmero from the 20th Precinct and no charges were lodged against him.

131.  He did so without further speaking with Defendant Ruster although Defendant Rossy had directed Defendant Kenney, on at least two occasions, to speak further with Defendant Ruster, quite obviously based on the fact that Defendant Kenney harbored and held strong doubt that any crime whatsoever had been committed and that materials were removed from the premises based on an authorization and consent and understanding thereof by the

Plaintiff provided by Defendant Ruster to at least the Plaintiff and to the other employees and based on the information otherwise provided to Defendant Kenney by Lance Kolb, the Schwab House building executive manager on February 28, 2006 that he-Kolb, would not be surprised if Defendant Ruster was making up the whole thing in order to get back at the Schwab House management and the rules of Schwab House that required him to pay monies to remove materials from a residence in Schwab House, rules which Defendant Ruster was seeking to evade and circumvent.

132.   Although he released Leo Palmero who had been seen removing the inoperable dryer from the Schwab House building, Defendant Kenney undertook to process to further detain and to hold the Plaintiff in custody and to have the Plaintiff processed through the system until the Plaintiff was released without bail, at an arraignment held on March 9, 2006, approximately twenty four hours after the Plaintiff was first taken into custody by Defendant Kenney.

133. In the early morning hours of March 9, 2006 at or about 2:45 A.M., Defendant Kenney executed a Misdemeanor Complaint in which he stated that, as the executing deponent, he was informed by Evan Ruster that Evan Ruster is the custodian of a clothing dryer" and that the Plaintiff did not have "permission or authority to possess or remove the dryer from [Evan Ruster's] apartment or the building.

134.   Defendant Kenney arrested the Plaintiff and executed the

Criminal Court Misdemeanor Complaint without having spoken to
Defendant Ruster again about what he had been informed to that
point in time.

135.  Furthermore, Defendant Kenney arrested the Plaintiff and
executed the Criminal Court Misdemeanor Complaint while possessing
doubt as to the veracity of the complaint filed by Defendant
Ruster with the New York City Police Department and while
possessing a belief that the complaint may have been fraudulent
and for an impermissible, unlawful and fraudulent purpose.

136.  Defendant Kenney arrested the Plaintiff and executed the
Criminal Court Misdemeanor Complaint without any belief that the
Plaintiff, if released, was any kind of risk of flight and, while
at the same time, having released from custody Leo Palmero, the
individual previously detained for questioning and the individual
identified in video material actually removing the inoperable
dryer from the Schwab House building.

137.  Defendant Kenney executed a Misdemeanor Complaint against
the Plaintiff, without probable cause and with reckless and
deliberate indifference to the rights of the Plaintiff, solely and
simply for allegedly stealing an inoperable dryer and nothing else
from Defendant Ruster's deceased mother's residence, this
notwithstanding that Defendant Kenney harbored strong doubt about
the veracity of the burglary complaint filed by Defendant Ruster
with the New York City Police Department.

138.  When Defendant Kenney arrested and detained the Plaintiff

and executed the Criminal Court Misdemeanor complaint against the
Plaintiff, he did so without speaking with Defendant Ruster again,
although being directed to do so by Defendant Rossy, and having
only spoken with Defendant Ruster on one occasion, back on
February 28, 2006 when, after speaking with him and after speaking
with Lance Kolb, Defendant Kennedy was possessed of doubt about
the veracity of the Defendant Ruster transmitted burglary
complaint to the New York City Police Department.

139.  On March 9, 2006, Defendant Kenney spoke with Michael
Rivera who had come to the Precinct and who informed Defendant
Kenney, at that time, that he did have custody and possession of
china and silverware and that he had been informed by the
Plaintiff that he could remove material and items from the
residence because the material and items were being discarded.

140.  Defendant Kennedy arrested Michael Rivera and detained
him and had him processed through the system as he had previously
done so with the Plaintiff and Fatch Alqalisa while releasing the
Leo Palmero, supposedly because, as reported in a Police
Department report executed by Defendant Kenney, Defendant Kenney
was informed in a telephone conversation with an New York County
Assistant District Attorney that the New York County District
Attorney's Office was declining to prosecute the individual in
whose custody and possession the dryer was first seen on the video
material.

141.  As of this time, Defendant Kenney had not spoke, again,

with Defendant Ruster and had only spoken with Defendant Ruster on one occasion, that being on February 28, 2006 when, as a consequence of such, Defendant Kennedy harbored doubt about the veracity of the burglary complaint made by Defendant Ruster to him, a doubt which was confirmed when Lance Kolb, on that same date, expressed a strong and serious doubt about the veracity of the complaint and expressed to Defendant Kenney a motive for Defendant Ruster to make a false burglary complaint.

142.  Defendant Kenney recovered the dryer, which he ascertained was, as it had been previously stated to him, inoperable, that is junk unless, of course, it could be repaired.

143.  Furthermore, on March 9, 2006, Defendant Kennedy obtained the china and silverware.

144.  On March 9, 2006, after having arrested the Plaintiff among others and without ever speaking with Defendant Ruster again regarding the alleged burglary he had reported and having taken a fourth individual into custody, detained that individual, and then released him supposedly because the New York County District Attorney's Office declined to prosecute that individual, Defendant Kenney finally spoke with Defendant Ruster for the second time, the first and only time on which he spoke to him being Defendant Kenney's initial telephone conversation with Defendant Ruster on February 28, 2006 when Defendant Kennedy was at the residence premises and inside of that premises.

145.  On March 9, 2006, after having already arrested the

Plaintiff, Defendant Kenney called Defendant Ruster and indicated to Defendant Ruster that he wanted Defendant Ruster to come to the 20th Precinct and "to answer a few questions" because as described in the Police Report made by Defendant Kenney in the course of his duties and functions related to the matter, "a few questions have arisen during the investigation".

146.   Defendant Ruster indicated to Defendant Kenney that he would only come to the Precinct with his attorney. Defendant Kenney stated that such was fine.

147.   Defendant Ruster, accompanied by his attorney, did come to the Precinct on March 9, 2006.

148.   At the Precinct, Defendant Ruster was informed that the inoperable dryer had been returned as had the silverware and china, all of which Defendant Ruster had reported were, among other things including a tool box, a painting, a fur coat, and a vacuum cleaner, alleged stolen from Defendant Ruster's deceased mother's residence.

149.   According to a police report executed by Defendant Kenney related to this matter, Defendant Kenney, after identifying the individuals whom he arrested as employees at the Schwab House building, stated to Defendant Ruster that "the people I arrested related to the event claimed that there were allowed to remove the property".

150.   Defendant Kenney also recorded in the Police Department report that Defendant Ruster admitted that he "did offer items to

the employees" but not those [items] which he reported stolen.

151.   Defendant Ruster stated to Defendant Kenney that "it was possible that they [the employees] misunderstood him".

152.   According to the Police Department report executed by Defendant Kenney, Defendant Ruster stated, moreover, that "he was happy just getting his property back" and that he [Defendant Ruster] "did not wish to press charges against any of the Defendants", this notwithstanding that he had been informed that the fur coat, the vacuum cleaner, the tool box, and the painting had not, apparently, been recovered.

153.   Defendant Ruster did not request that the investigation continue as to the other items, as described, alleged to have been stolen including, supposedly, a fur coat and a painting, and Defendant Kenney did not continue to press an investigation into the alleged un-recovered, allegedly stolen other items.

154.   Defendant Kenney, while believing that there may very well have been a false report filed by Defendant Ruster for improper purposes, the filing of which is a crime, did not elect to press charges against Defendant Ruster.

155.   As recorded in the paper work which Defendant Kenney executed in this matter, Defendant Kenney informed Defendant Ruster that he "would be legally required to tell the Manhattan District Attorney prosecuting the case" that, because Defendant Ruster felt that it was "all a big misunderstanding", he did not want to press the case because he—Defendant Kenney, "was not

authorized to stop the prosecution at this point in time".

156.  It is believed that Defendant Kenney after his conversation with Defendant Ruster on March 9, 2006 as described, Defendant Kenney closed the case.

157.  Because of the complaint made by Defendant Ruster against the Plaintiff, the Plaintiff was arrested and spent a night in jail before being released.

158.  The Plaintiff appeared in Court on May 4, 2006 when, on that date, the charges against the Plaintiff were, in all respects, dismissed and the matter sealed.

159.  Because of the circumstances the Plaintiff was terminated from his employment.

160.  The Plaintiff did nothing wrong, criminal, unlawful, or improper and he did not in any way facilitate any improper, wrongful, unlawful, or criminal conduct by others.

161.  As previously stated, the Plaintiff never lied either to the police or to the management of the Schwab House. He was truthful because he had nothing whatsoever to hide and because ha had done nothing wrong, improper, unlawful, or criminal.

162.  The Plaintiff's arrest and the charges made against him were common knowledge among the residents of the building and, once the charges were dropped and the criminal proceedings dismissed, notice of the latter was posted.

163.  The Plaintiff was arrested and detained and subjected to criminal prosecution without probable cause.

164.  Defendant Kenney knew or should have known that the Plaintiff was innocent of any criminal conduct when he arrested and detained the Plaintiff in custody.

165.  After the Plaintiff was arrested and being detained in custody, Defendant Kenney knew or should have known that the Plaintiff was innocent of any criminal wrong doing and there was no probable cause for the arrest or detention or continued prosecution of the Plaintiff; and it is believed that Defendant Kenney expressed his view in this regard and respect to the Plaintiff while the Plaintiff was still being held at the 20th Precinct and before the Plaintiff was transported to Manhattan Central Booking and put through the system and held until his arraignment when the Plaintiff was then released.

166.  Defendant Rossy knew or should have known that there was no probable cause basis for the arrest and detention of the Plaintiff and the prosecution of the Plaintiff and, yet, he authorized and sanctioned and otherwise participated in the arrest and custodial detention and prosecution of the Plaintiff in lieu of releasing the Plaintiff, without charge, on March 8, 2006.

167.  The Plaintiff was falsely arrested, maliciously prosecuted, and was subjected to excessive and unnecessary and unreasonable detention, and subjected to malicious abuse of criminal prosecution and subjected unequal treatment by Defendants Kenney and Rossy, all in violation of rights guaranteed to the Plaintiff under the Fourth and Fourteenth Amendments to the United

38

States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

168.  Defendant Ruster intentionally, recklessly, and maliciously and with deliberate indifference filed a burglary complaint with the New York City Police Department the natural and foreseeable consequence of which resulted in the arrest of the Plaintiff.

169.  Defendant Ruster knew or should have known but for his reckless and deliberately indifferent disregard for the truth that the charge which he filed with the New York City Police Department was not true and his course of conduct, in his initial reporting and thereafter in his conduct otherwise, was a direct and proximate cause of and for the arrest and detention of the Plaintiff, the criminal prosecution of the Plaintiff and, as well, the termination of the Plaintiff flowing from the same and the injury to the Plaintiff's reputation because of the dissemination of the Plaintiff's participation in an alleged burglary which had no basis in fact.

170.  The actions and conduct of Defendant Ruster subjected the Plaintiff to false arrest, malicious prosecution, malicious abuse of criminal process, interference with and into the Plaintiff's employment with Schwab House, and defamation, all in violation of rights guaranteed to the Plaintiff under the laws and Constitution of the State of New York.

## V.  CAUSES OF ACTION

## A. FIRST CAUSE OF ACTION

171.    The Plaintiff reiterates Paragraph #'s 1 through 170 and incorporates such by reference herein.

172.    The Plaintiff was unlawfully and excessively stopped and detained and falsely arrested and falsely imprisoned and excessively detained and imprisoned by Defendants Kenney and Rossy in violation of his rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

173.    The Plaintiff suffered injuries and damages.

## B. SECOND CAUSE OF ACTION

174.    The Plaintiff reiterates Paragraph #'s 1 through 173 and incorporates such by reference herein.

175.    The Plaintiff was subjected to malicious prosecution by Defendants Kenney and Rossy in violation of the Plaintiff's rights as guaranteed under the Fourth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

176.    The Plaintiff suffered injuries and damages.

## C.   THIRD CAUSE OF ACTION

177.    The Plaintiff reiterates Paragraph #'s 1 through 176 and incorporates such by reference herein.

178.    The Defendants Kenney and Rossy subjected the Plaintiff to malicious abuse of criminal process in violation of the Plaintiff's rights as guaranteed pursuant to and under the

Fourteenth Amendment to the United States Constitution and the
Civil Rights Act of 1871, 42 U.S.C. Section 1983.

179.    The Plaintiff suffered injuries and damages.

### D.    FOURTH CAUSE OF ACTION

180.    The Plaintiff reiterates Paragraph #'s 1 through 179 and
incorporates such by reference herein.

181.    The Plaintiff was subjected to unequal treatment by
Defendants Kenney and Rossy in violation of his rights as
guaranteed under the Fourteenth Amendment to the United States
Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section
1983.

182.    The Plaintiff suffered injuries and damages.

### E.    FIFTH CAUSE OF ACTION

183.    The Plaintiff reiterates Paragraph #'s 1 through 182 and
incorporates such by reference herein.

184.    Defendant Ruster caused the Plaintiff to be subjected to
false arrest, false imprisonment, excessive detention, and
malicious prosecution and malicious abuse of criminal process in
violation of the Plaintiff's rights as guaranteed under the laws
and Constitution of the State of New York.

185.    The Plaintiff is suffered injuries and damages.

### F.    SIXTH CAUSE OF ACTION

186.    The Plaintiff reiterates Paragraph #'s 1 through 185 and
incorporates such by reference herein.

187.    Defendant Ruster caused the Plaintiff to be subjected to

the intentional publication of defamatory and false claims against the Plaintiff which, in the form of a Criminal Complaint filed with the Police and presented to Court was defamation <u>per</u> <u>se</u>; and otherwise in the posting of the Plaintiff's employment status at the Schwab House location of the Plaintiff's employment, which caused the Plaintiff to be held in disrepute by some persons in the Schwab House community.

188.  Such violated the Plaintiff's rights under the laws and Constitution of the State of New York.

189.  The Plaintiff suffered injuries and damages.

### G.    SEVENTH CAUSE OF ACTION

190.  The Plaintiff reiterates Paragraph #'s 1 through 189 and incorporates such by reference herein.

191.  Defendant Ruster intentionally and recklessly and with deliberate indifference engaged in conduct designed to interfere with the Plaintiff's employment resulting, as it did, in the Plaintiff's termination from his fifteen year position with Schwab House.

192.  Such conduct violated the Plaintiff's rights under the laws and Constitution of the State of New York.

193.  The Plaintiff suffered injuries and damages.

WHEREFORE and in light of the foregoing, the Plaintiff respectfully requests that the Court:

        a. Assume federal question jurisdiction.

        b. Assume pendent party and inter-related pendent claim jurisdiction.

        c. Award the Plaintiff compensatory and punitive damages against each of the Defendants, individually, and against the Defendants, collectively.

        d. Award such other and further relief as the Court deems appropriate and in the interest of justice.

        e. Award reasonable fees and costs.

        f. Empanel a jury to consider the claims/issues.

DATED: New York, New York
       December 30, 2007

                    Respectfully submitted,

                    James I. Meyerson /s/_____
                    JAMES I. MEYERSON [JM 4304]
                    64 Fulton Street-Suite # 502
                    New York, New York 10038
                    [212] 226-3310
                    [212] 513-1006/FAX
                    ATTORNEY FOR PLAINTIFF
                    BY:_____